UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID SANTANA,<br><br>Defendant | Criminal No. 23cr10191<br><br>Violation:<br><br>Count One: Conspiracy to Commit Health Care Fraud<br>(18 U.S.C. § 1349)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(7)) |

## INFORMATION

At all times relevant to this Information:

### General Allegations

*The Defendant*

1. Defendant DAVID SANTANA, a resident of Middlesex County, Massachusetts, was the owner, manager, and operator of Conclave Media LLC and Nationwide Health Advocates LLC.

*Related Entities*

2. Conclave Media LLC ("Conclave") was a purported Delaware limited liability company doing business in the District of Massachusetts. Conclave was a purported telemedicine company.

3. Nationwide Health Advocates LLC ("Nationwide") was a purported Delaware limited liability company doing business in the District of Massachusetts. Nationwide was a purported telemedicine company.

4.      Beginning in or about January 2018 and continuing through in or about August 2021, DAVID SANTANA owned and operated Conclave and Nationwide, including in the District of Massachusetts.

*The Medicare Program*

5.      The Medicare Program ("Medicare") was a federally funded health insurance program affecting commerce that provided health care benefits to persons who were 65 years of age and older or disabled. The benefits available under Medicare were governed by federal statutes and regulations.

6.      Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b).

7.      The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services, oversaw and administered Medicare.

8.      Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

9.      Medicare included coverage under component parts. Medicare Part B covered, among other things, physician services, outpatient care, and durable medical equipment ("DME").

10.     Health care providers that provided services to Medicare beneficiaries, including durable medical equipment suppliers and pharmacies, were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

*Durable Medical Equipment*

11. DME was reusable medical equipment such as orthotic devices, walkers, canes, and hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

12. Medicare reimbursed DME providers for medically necessary items and services rendered to beneficiaries. In claims submitted to Medicare for the reimbursement of DME, providers were required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and provider number of the provider who prescribed or ordered the equipment.

13. Medicare would pay claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of a diagnosed and covered condition, and was provided to a beneficiary. When seeking reimbursement from Medicare, providers submitted, among other things, the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System ("HCPCS").

14. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations.

15. For certain types of orthotics, such as knee braces billed under HCPCS code L1833, Medicare Local Coverage Determinations ("LCDs") required that a provider conduct an in-person examination of a beneficiary and document that examination in the beneficiary's

medical record. According to the LCDs, knee braces ordered without a documented in-person examination were not medically necessary and not appropriately reimbursable.

*Genetic Testing*

16. Genetic testing for hereditary cancer used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Genetic testing was not a method of diagnosing whether an individual presently had cancer. Pharmacogenetic testing used DNA sequencing to assess how well a patient would likely respond to a specific drug therapy based on the patient's genes. Medicare's rules and regulations covered cancer genetic testing and pharmacogenetic testing; references to genetic testing included both types of tests.

17. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). In other words, Medicare generally did not cover tests used for screening purposes. However, among the statutory exceptions Medicare covers were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." These statutory exemptions did not include genetic testing.

18. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. 42 C.F.R. § 410.32(a) provided that "All diagnostic x-

ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

19. Because genetic testing did not fall within the statutory exceptions for use as a screening test, Medicare only covered such tests in limited circumstances. For example, for cancer genetic testing, Medicare's coverage was generally limited to when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover cancer genetic testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

*Telemedicine*

20. Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

21. Legitimate telemedicine companies provided telemedicine or telehealth services to individuals by hiring doctors and other health care providers. Legitimate telemedicine companies typically paid doctors a fee to conduct consultations with patients. To generate revenue, legitimate telemedicine companies typically either billed insurance for the consultation, like an office visit, or received payment from patients who utilized the services of the telemedicine company. By contrast, in telemedicine fraud schemes, the telemedicine companies paid based on the number of orders a medical provider reviewed and typically neither billed

insurance for office visits nor collected fees from beneficiaries because no legitimate consultation occurred.

22. Medicare Part B covered expenses for specified telehealth services if certain requirements were met. During much of the relevant period, these requirements included that (a) the beneficiary was located in a rural or heath professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner. *See* 42 C.F.R. § 410.78(b). During the COVID-19 pandemic, Medicare still required live video or audio communication (depending on the service being provided) between the practitioner and the beneficiary.

## Overview of the Conspiracy

23. From in or about January 2018 and continuing to in or about August 2021, DAVID SANTANA and others known and unknown to the United States conspired to commit health care fraud by: using telemarketers or call centers to obtain medical information from or about Medicare beneficiaries; using that information to prepare medical documentation, including orders, for DME and genetic testing for Medicare beneficiaries that made it appear that medical practitioners were providing legitimate consultations to these beneficiaries; recruiting and facilitating medical practitioners signing these orders without consulting with the beneficiaries; and arranging for DME suppliers and laboratories to submit claims to Medicare for orders for DME and genetic testing. These orders were medically unnecessary, based on false documentation, tainted by kickbacks and bribes, and otherwise not covered by Medicare.

Medicare would have denied these claims had it known the process by which these claims were generated.

### Object and Purpose of the Conspiracy

24. The object of the conspiracy was to obtain payment from Medicare for claims for DME and genetic testing that were medically unnecessary, based on false documentation, tainted by kickbacks and bribes, and that Medicare otherwise would not have reimbursed. The principal purpose of the conspiracy was for DAVID SANTANA and others known and unknown to the United States to unlawfully enrich themselves by, among other things, soliciting, offering, paying, and receiving kickbacks and bribes designed and intended to generate orders and medical records for DME and genetic testing (collectively "doctors' orders") without regard to medical necessity, accuracy of the medical orders and records, and whether the DME and genetic testing were eligible for reimbursement, for which DME companies and laboratories submitted claims for payment by Medicare and diverted the fraud proceeds for their personal use and benefit.

### Manner and Means of the Conspiracy

25. Among the manner and means by which DAVID SANTANA and coconspirators known and unknown to the United States carried out the conspiracy were the following:

26. Offering, agreeing to pay, and paying kickbacks and bribes to obtain Medicare beneficiary information sufficient to create doctor's orders for DME and genetic testing.

27. Agreeing to receive, soliciting, and receiving kickbacks and bribes from telemarketers and telemarketing companies in exchange for doctor's orders for DME and genetic testing that were not medically necessary and not eligible for Medicare reimbursement.

28.     Facilitating the creation of doctor's orders based on Medicare beneficiary information provided by telemarketers, which were designed to make it appear as if the medical practitioner personally examined and treated the Medicare beneficiaries.

29.     Working with medical staffing companies to find medical practitioners willing to order DME and genetic testing.

30.     Medical practitioners signing the orders even though they typically had no prior relationship with the beneficiaries, were not treating the beneficiaries, did not use the genetic testing results in the treatment of the beneficiaries, and did not conduct a proper telemedicine visit.

31.     Offering, agreeing to pay, and paying kickbacks and bribes to medical staffing companies and medical practitioners in exchange for doctor's orders for DME and genetic testing that were not medically necessary and not eligible for Medicare reimbursement.

32.     Causing DME suppliers and laboratories to submit approximately $44.3 million in false and fraudulent claims to Medicare, for which Medicare paid approximately $23.5 million, for DME and genetic testing that were (a) induced through kickbacks, bribes, and other illicit incentives; (b) designed for maximum reimbursement and regardless of medical need; (c) not medically necessary; (d) not eligible for reimbursement; and (e) not properly prescribed by a medical practitioner (i) for genetic testing, treating the beneficiary for cancer or symptoms of cancer and using the results in the treatment of the beneficiaries, or (ii) having a legitimate physician-patient relationship with the beneficiary.

33.     Concealing the submission of false and fraudulent claims to Medicare.

34. Diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### Acts in Furtherance of the Conspiracy

35. From in or about January 2018 through in or about August 2021, DAVID SANTANA and co-conspirators known and unknown to the United States committed and caused to be committed the following acts, among others, in furtherance of the conspiracy:

    a. On or about November 16, 2018, DAVID SANTANA emailed an individual helping to process doctor's orders regarding a list of 94 beneficiaries that a "buyer" needed orders for.

    b. On or about January 24, 2020, DAVID SANTANA caused an online banking transfer of $20,000 from the Conclave bank account ending in x1962 to a staffing company for "assessments" performed by medical practitioners.

<u>COUNT ONE</u>
Conspiracy to Commit Heath Care Fraud
(18 U.S.C. § 1349)

The United States charges:

36. The United States re-alleges and incorporates by reference paragraphs 1-35 of this Information.

37. From in or about January 2018 through in or about August 2021, in the District of Massachusetts, and elsewhere, the defendant,

DAVID SANTANA,

knowingly and willfully conspired with others known and unknown to the United States to commit health care fraud, that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money or property owned by, or under the custody and control of, health care benefit programs, in violation of Title 18, Untied States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(7))

The United States Attorney further alleges:

38. Upon conviction of the offense in violation of Title 18, United States Code, Section 1349, set forth in Count One, the defendant,

### DAVID SANTANA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. The property to be forfeited includes, but is not limited to, the following asset(s):

    a. $2,430,858.00, to be entered in the form of a forfeiture money judgment.

39. If any of the property described in Paragraph 38, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(7), as a result of any act or omission of the defendant --

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 38 above.

All pursuant to Title 18, United States Code, Section 982(b)(7).

                                              JOSHUA S. LEVY
                                              Acting United States Attorney
                                              District of Massachusetts

                                              _____
                                              ALEXANDRA BRAZIER
                                              LAUREN GRABER
                                              HOWARD LOCKER
                                              LINDSEY ROSS
                                              Assistant United States Attorneys
                                              District of Massachusetts

July 21, 2023